# A. P. and A. J. Goddard v. Maria Enzler, Administratrix.

## Gen. No. 4,510.

1. EXPERT TESTIMONY—*when competent with respect to the issue before the jury.* It is competent to permit experts to give their opinions as to how an injury occurred where, from the nature of the case, no one could testify to the facts so that the jury could see how it did occur and where from all the facts proven inexperienced persons might, without the aid of such testimony, be incapable of forming a correct conclusion; but the questions calling for such opinions should not call for answers absolute in character, but should be limited to the inquiry as to how the injury might have occurred.

2. CONDITIONS AFTER INJURY—*what essential to competency of.* In order to render conditions prevailing after an injury competent, it is essential that it should be shown that they had in no wise changed since the accident.

3. WITNESS—*when competent, notwithstanding adverse party sues in representative capacity.* A party is competent in his own behalf as to facts occurring after the subject-matter of the action arose, notwithstanding the adverse party sues or defends in a representative capacity.

4. EXCLUSION OF EVIDENCE—*when, though erroneous, will not reverse.* The exclusion of competent evidence will not reverse where such evidence if admitted would not have affected the result.

5. MEASURE OF DAMAGES—*when instruction as to, in action for death caused by alleged wrongful act, is not erroneous.* In such a case an instruction is not improper which permits the jury to consider the loss of moral instruction and training.

6. ELECTRICITY—*extent of obligation of those using.* Those who use electricity are bound to the exercise of ordinary care, and such ordinary care is measured by the dangers which are known to arise from its use.

7. ELECTRICITY—*what not essential to establish negligent use of.* It is not essential, in order to establish negligence in the employment of electricity, to show precisely how an injury occurred and the particular defective agency employed. It is enough if, from all the evidence, the jury may reasonably conclude that there was a defect in some agency employed.

8. RES IPSA LOQUITUR—*when doctrine of, applies.* The doctrine of *res ipsa loquitur* sometimes applies as between master and servant, as, in this case, where the injury resulted to the servant through the employment by the master of a defective electric appliance.

Action on the case for death caused by alleged wrongful act. Appeal from the Circuit Court of Stephenson County; the Hon. RICHARD S.

FARRAND, Judge, presiding. Heard in this court at the April term, 1905. Affirmed. Opinion filed October 25, 1905.

W. N. CRONKRITE, for appellants.

DOUGLAS PATTISON, for appellee.

MR. PRESIDING JUSTICE VICKERS delivered the opinion of the court.

Appellee, as administratrix of her deceased husband, recovered a judgment against appellants for $3,500 for negligently causing the death of appellee's intestate. Appellants owned and operated an electric light, railway and power plant in the city of Freeport, the electricity for which was generated by appellants at their power house and distributed over their wires to the various parts of the city for both public and private use. At the intersection of Liberty and Spring streets the building known as the car barn was located. This building was 250 feet long by thirty-five feet wide and eighteen feet high, made of brick with a flat roof covered with pitch and gravel composition. The floor was made of cinders. There were two lines of tracks laid in the barn which were used to run cars in for repairs, and for shelter when not in use. Between the rails of one of these tracks a trench forty feet long, five feet deep and four feet wide was constructed so that the car inspectors could get under the cars on the track and examine, clean and, if need be, repair them. Appellants had provided an electric light, attached to a flexible cord about thirty feet long, which the employees used when working in the trench under the cars. The other end of the cord was attached to the north wall of the car barn. There were other incandescent lights in the car barn, all of which were connected with a transformer, which was located on a pole across the street north of the car barn. Just east of the car barn a vinegar factory was located, and still further east were the freight offices of the Illinois Central and Northwestern Railroads. The car barn, vinegar factory and the railroad offices were all supplied with electric lights by secondary wires connected with the transformer above de-

scribed. The system of lighting in use by appellants is known among electricians as an alternating system. The wires running from the dynamo to the transformer are called primary wires, and carry 2,280 volts, which renders the primary wires very dangerous to human life. The wires running from the transformer to the buildings, and to which the lights are attached, are called secondary wires and carry only 104 volts, and are not dangerous. Appellants maintained four wires, two primary and two secondary wires, which passed over the roof of the car barn to a transformer on the opposite side of the street. Appellee's husband was an employee of appellants, and his duty was to clean and repair cars in the car barn, his hours being from six P. M. to six A. M. On the 14th of November, 1902, about nine o'clock P. M., the deceased was found lying on his back near the edge of the trench, with one arm on the rail of the track, the electric light attached to the flexible cord in his right hand and the cord lying across his breast. Investigation disclosed the fact that he had been killed by a shock of electricity received from the flexible wire, which he still held in his hand.

There is no room to doubt that John Anton Enzler was killed by a primary current of electricity passing through his body from the secondary wire attached to the light which he held in his hand. The circumstances exclude every other reasonable hypothesis, so that this fact is established even by a higher degree of proof than the law in civil cases requires. In order to account for the death of Enzler from a shock from the primary current two things must concur, neither of which would alone produce the result. First, there must be a "ground" somewhere on the primary line, and second, there must be a connection somewhere between the primary and secondary lines by which the primary current can escape from the primary to the secondary lines. With these two conditions concurring, when the deceased took hold of the flexible wire, with his feet on the ground, the circuit would be complete and he would receive the deadly shock. A ground is defined as a leakage

from the wire to something that is connected with the earth, such as the twigs of a tree or the roof of a building, to which a leakage of the current may escape, due usually to defective insulation. The connection of the primary wire with the secondary happens when the two are crossed or brought in such close proximity to each other that the current will jump from the primary to the secondary wire. This is also usually due to improper insulation.

In the several counts of appellee's declaration it is charged that appellants negligently maintained their wires without proper insulation; that the transformer was negligently and improperly managed and maintained, and that the plant was carelessly and improperly operated with defective machinery and appliances, by means of which the injury resulted as above stated.

In order to prove the negligence charged appellee proved the death, the manner in which the wires were maintained in and about the car barn, and their connection at the transformer and how they were strung over the barn, and other physical facts connected with the operation of appellants' plant, and then called expert electricians and embodying these facts in hypothetical questions, asked the experts how, in their opinion, the deceased might have received the shock. These questions were objected to, and the rulings of the court, in permitting the witnesses to answer them, are assigned as error. The following questions were asked, and the answers were allowed to go to the jury over the objection of appellants:

" Q. Suppose that a primary two-wire circuit carrying about 2,200 volts alternating current ran to a general electric ten kw. transformer on a pole; that from the transformer a secondary circuit, supposed to be carrying 104 volts supplying incandescent lights, ran back alongside of the primary wires and from ten to twelve inches distant from them to a pole and thence to a car barn; that from and inside the car barn an insulated flexible wire ran back to an incandescent electric light, and a man who was stand-

ing on cinders packed about ten inches deep, grasped hold of the insulated wire or of the light socket and received a shock of electricity, which burned his hand and killed him, will you state in your opinion how he might have received that shock? A. He might have received that shock by the primary current leaking onto the secondary wire, to which the man had his hand attached and through his feet to the other side of the generator which generated the current which produced the high voltage primary that you speak of.

"Q. How could a higher current than 104 volts get on those primary wires? A. By the primary and secondary wires getting crossed with one another, the wind blowing them together accidentally, or there might be a leakage in the transformer.

"Q. Does that sometimes happen, a leakage in the transformer? A. It does on some occasions. Lots of times a transformer is overloaded and heats it and it gets affected that way.

"Q. Might a transformer be so affected that a higher current than 104 volts, and still not 2,280 volts, could go along that secondary wire? A. If a higher current than 104 volts came out of the transformer it would go all over the lines of that secondary circuit that were connected up.

"Q. Suppose those wires should blow together and those insulated points should come together for an instant, would that be long enough for that high voltage you speak of to go through? A. Yes, sir."

It is strenuously insisted by appellants' counsel that the admission of this testimony was erroneous. The objection is that the questions invade the province of the jury and call for an opinion on the question being tried by the jury, and that they are leading and not based on the evidence.

The question here to be determined was, did the current of electricity which killed the deceased come over the wires of appellants because of the negligence of appellants as charged in the declaration? From the very nature of the case no one could testify to the facts so that the jury

Goddard v. Enzler.

could say how the injury occurred. It is one of the cases where, after all the facts are proved, inexperienced persons are likely to be incapable of forming a correct conclusion without the aid of persons skilled in electrical science; hence it is a proper subject of expert testimony. Rogers' Expert Testimony, p. 22; Jones v. Tucker, 41 N. H. 546. A resort to expert testimony in all cases rests on necessity; where all the facts can be detailed to the jury and they are of such a nature that the jury can properly comprehend and weigh them, opinion or expert testimony will be rejected. Linn v. Sigsbee, 67 Ill. 75; City of Chicago v. McGiven, 78 id. 347. But, conceding that the circumstances of the case justified a resort to this class of testimony, it is argued that the court erred in permitting the questions to be put in the form of those above quoted and others of a similar character not herein set out, and the cases of C. & A. R. R. v. S. & Northwestern R. R., 67 Ill. 142, Ill. Central R. R. v. Smith, 208 Ill. 608, and Treat v. Mer. Life Assn., 198 Ill. 431, are relied on by appellants to support their contention. A careful reading of the above cases will disclose that in each of them the witness was permitted to answer a question which if the jury believed, the witnesses left the jury nothing to do but record what the witnesses had said as the verdict of the jury. It is also to be noted that in each of the cases relied on by appellants the court rested its judgment on other grounds as well as that the questions covered the question submitted to the jury. In the Treat case the question was whether the insured had committed suicide or had been killed accidentally. The court holds that this is not a proper subject of expert testimony. In the Smith case the question was whether the injury to Smith's foot had been caused by a smooth or rough surface, and the court there holds that "if the physicians who were called had confined their evidence to a description of the foot of appellee as they found it after the injury, the jury, from such evidence, would have been in as good condition as they to determine whether the injury had been caused by the foot being crushed between even or uneven surfaces." This virtually

takes the case out of the class in which expert testimony
is admissible. The court proceeds however to show that
the form of the questions and the answers thereto invaded
the province of the jury. The rule laid down in this case
does not sustain appellants' contention; on the contrary it
is a direct authority sustaining the court in permitting the
questions asked and answered in the case at bar. It is held
in this case that it is not proper to ask an expert upon a
hypothetical state of facts what in his opinion caused the
injury, but that it is proper to ask what in his opinion *might*
have caused it. The questions propounded to the expert
witnesses in the case before us were so framed as to call
for the opinion of the witness as to how the primary cur-
rent might have gotten onto the secondary line and are
clearly within the rule laid down in the cases above cited.

It is next urged that the court erred in refusing to allow
appellants to prove by the witness Green that he received
a shock by coming in contact with the secondary wires in
the car barn about three o'clock in the morning after the
accident and after the primary wires had been cut off. This
proof was properly rejected for several reasons : First,
it was six hours after the accident, and there was no proof
or offer of proof to show that all the conditions were the
same as they were at the time Enzler was killed; second,
there is no proof nor offer of proof that the shock received
by Green was of such severity as to indicate that it was
from the primary current; and third, even if the shock had
been of the same character as that received by the deceased
and all the conditions had been the same except that the
primary currents had been cut off, it would only tend to
prove that the appellants were using a high and danger-
ous voltage on the secondary wires, which were intended
only to carry 104 volts, but would not in any degree tend
to lessen their liability.

A. J. Goddard, one of appellants, was introduced as a
witness in behalf of appellants, and was asked if he made
an examination of the wires, and what condition he found
them in after the accident, but during the same night.

The court sustained an objection to Goddard's testimony apparently on the ground that he was incompetent to testify in his own behalf, because appellee was suing as administratrix. In this the court erred, since the facts which he was offering to prove occurred after the death of appellee's intestate, and as to such facts the statute makes a party to the suit competent, but since the same facts were proven by other witnesses and there was no dispute but that there had been an examination that night by Goddard and others which failed to locate any trouble with the wires or transformers, and appellants had the benefit of this testimony, we are of the opinion the error is not sufficient to justify a reversal of the judgment. The admission of this evidence would not have changed the result. The jury would still have believed, no doubt, that there was somewhere a serious defect in the machinery or appliances which resulted in killing Enzler, even if it did appear that a careful investigation made in the night failed to locate the defect. Where competent evidence is excluded and its admission would not have changed the result of the trial, the error in refusing it is harmless. Root v. Curtis, 38 Ill. 192; Hill v. Parsons, 110 id. 107; Lennartz v. Quilty, 191 id. 174.

Appellants complained of the fourth and ninth instructions given on behalf of appellee. That clause in the fourth instruction of which complaint is made is as follows: " In fixing your damages you may take into consideration the support of the widow and the children of the deceased, so far as the same appears from the evidence, and the instruction and moral training of the minor children," etc. The objection is to the use of the words "instruction and moral training of the minor children" as an element of damages. Where there is evidence on which to base such an instruction we see no reason for refusing to give it. Instruction and moral training are among the most valuable assets that a boy or girl can receive from a father. The deceased was 40 years old. He left a widow and eight children, aged 2, 4, 8, 10, 14, 16, 17 and 18 years. The old-

est, a son, testified that his father was a man of careful, sober habits; that he instructed the children in good behavior, prayers, going to church, in right and wrong, and obedience to father and mother. This evidence was proper and furnished a basis for the instruction under consideration. In I. C. R. R. Co. v. Weldon, 52 Ill. 291, a similar instruction was held a misdirection for the reason there was no proof to base it on, but the principle of law stated is expressly approved on the authority of Tilley v. Hudson River R. R. Co., 29 N. Y. 252. The court there say: "To the principle of this instruction we perceive no objection," but there being no proof that the deceased was fitted by nature, education or disposition to furnish his children instruction, moral or physical training, it was held the court erred in giving the instruction. The instruction is supported also by Heyer v. Salsbury, 7 Ill. App. 93.

The ninth instruction announces a correct principle of law. It tells the jury that the defendants owed the duty to use ordinary and reasonable care in supplying and maintaining proper instrumentalities for the performance of the work required of the deceased, and that such ordinary care is commensurate with known dangers. The objection to this instruction is that "it places on appellants onerous duties and responsibilities which neither the statute nor the common law has imposed on them." Negligence has been defined to be "the absence of care according to the circumstances."

The degree of care which the master is to observe is measured by the dangers to be apprehended or avoided; or, in other words, it must be proportionate to the dangerous nature of the means, instruments, and machinery used. Labat on Master and Servant, Vol. I, sec. 16, and cases there cited in note. The law does not fix any invariable standard of the care required of the master in the selection of the instrumentalities and appliances with which the work is to be performed, or in the amount or character of the oversight and watchfulness required to see that the instrumentalities and appliances are in proper order to do

the work for which they are designed, but the rule of law on this subject is flexible and requires the degree of care to increase or decrease as the danger to be apprehended from the nature of the work or the use of the instrumentalities increases or decreases. The instruction under consideration simply announces the well-established rule and applied it to the facts of this case and no error was committed in giving it to the jury.

It is urged as a further ground for the reversal of this judgment that the burden of proof was on appellee to establish the specific charge of negligence alleged in some one or more counts of the declaration, and that the evidence not only preponderates against the verdict but that it was so insufficient that the court should have directed a verdict for the defendants below. That the burden of proof rests with appellee to establish the negligence charged in some one of the counts of her declaration by a preponderance of the evidence is too well established to admit of controversy, but we cannot lend our assent to the latter portion of appellants' contention that the evidence wholly fails to establish the negligence set up in any of the counts of appellee's declaration. When appellee proved the facts as set out by us herein, every element necessary to make a *prima facie* case was proven except the one single element of notice of the defect to appellants. To prove the fact of notice appellee showed that at about nine o'clock in the forenoon of the day on which Enzler was killed an employee working in the vinegar factory received a shock that rendered him unconscious for fifteen minutes by coming in contact with one of the secondary wires that was strung from the same pole and received its current from the same transformer as the one that killed Enzler. Immediately after the happening of this accident in the vinegar factory Mr. Siecke, proprietor of the vinegar factory, called up A. J. Goddard, over the telephone, and reported what had happened and received a reply that the matter would be attended to. It is true this witness could not be positive it was Mr. Goddard he talked to, but gave it as his best recollection it was

Goddard. Mr. Goddard denied receiving this message, but says he afterwards learned in November such a message had been sent, but he failed to state who received the message from Mr. Siecke. Evidently someone at Mr. Goddard's phone received the message. At about three o'clock in the afternoon another employee at the vinegar factory received a shock similar to the first. Both of these men came near losing their lives in substantially the same way Enzler lost his. Nothing having been done to remedy the defect by appellants, Mr. Baumgarten, an electrician, then in the employ of Mr. Parker, was called to the vinegar factory to examine the wires. He received a shock, but failed to locate the exact cause of the trouble. At half past five o'clock he notified Mr. Goddard. When notified Mr. Goddard gave directions to have the wires in the vinegar factory cut out, which was done, but nothing was done nor was any notice given to the car barn employees as to the danger to be expected from those wires although they came from the same pole and transformer as those in the vinegar factory. It has already been pointed out that the fact of the shock being received by these various persons on the day in question could only happen when there was a ground on the primary wire somewhere. It is shown that there is a device connected with the switchboard known as a ground detector. Appellants had such a device in use at the power house. Clearly the ground that caused the trouble must have existed for at least twelve hours before Enzler was killed. If so, the detector at the switchboard should have indicated it, and it was the duty of appellants' agent to discover it and to cause it to be sought for and remedied. Nothing, however, appears to have been done until about six o'clock in the evening; after it was too dark to make a thorough examination, two men without lanterns went over the lines and failed to find anything wrong. The examination was not of the character that enables the men who made it to swear that everything was all right. It is reasonably certain that the same defect and the same ground that had caused the three shocks during the day,

one at 9 A. M., another at 3 P. M. and the third at about 5 P. M., also caused the fourth one at 9 P. M. which caused the death ·of Enzler. Under these circumstances we are disposed to agree with the jury and the court below that appellants had such notice as the law requires in order to hold them responsible.

It appears to be assumed by appellants that in order to justify the court in sending this case to the jury that appellee should prove the negligence charged so clearly that the jury could find, not merely that appellants were guilty, but also to locate and point out by the testimony the precise locality and character of the defect and then bring notice of its existence home to appellants long enough before the accident to have enabled appellants in the exercise of reasonable care to have remedied it before the injury. This the law does not require in cases of this kind. The doctrine of *res ipsa loquitur* applies where the accident could not have happened in the usual course of things had ordinary care been exercised. This doctrine raises a presumption of negligence from the happening of the accident, but does not shift the burden of proof. A party injured by a live wire is not required to point out the specific cause of the accident; it is sufficient to prove facts from which the jury can infer that there was a defect in the wire or in the operation of the plant. Wolpers v. N. Y. & Q. Elec. L. & P. Co., 86 N. Y. Sup. 845. There are many cases in this state where this doctrine has been applied, the latest, so far as we have been able to find, is Union Traction Co. v. Newmiller, 215 Ill. 383. Most of the cases where the maxim of *res ipsa loquitur* is applied grow out of the relation of passenger and carrier, but it applies in a proper case between master and servant. Labat on Master & Servant, Vol. 2, sec. 834; Wight Fire Proofing Co. v. Poczekai, 130 Ill. 139; Armour v. Golkowska, 95 App. 495.

It was held in Jones v. Union Ry. Co., 18 N. Y. App. Div. 267, that where a span wire charged with electricity broke, one end fell and burned through plaintiff's hat and destroyed his eye the doctrine of *res ipsa loquitur* applied.

In Clarke v. Nassau Electric R. R., 9 N. Y. App. Div. 51, where "the plaintiff's horse, while crossing the rails of defendant's railroad, was killed by an electric shock from some source," the court said : " The plaintiff or any other traveller suffering a similar misadventure, could have no means of ascertaining the precise state of defendant's plant in respect to insulation or in respect to contact with other electrical energy." The occurrence of the injury alone was held to afford *prima facie* evidence of negligence and unless overcome by the evidence of the company would justify a verdict for the plaintiff, and that the maxim of *res ipsa loquitur* applied to the case. When the circumstances surrounding the case at bar are considered and carefully compared with the essential facts in cases where the doctrine of this maxim has been held to apply, as well as the underlying reason for the rule, we can reach no other conclusion than that the case at bar is one in which the maxim under consideration applies. It follows that the court committed no error in refusing to take the case from the jury on the plaintiff's evidence. When appellee rested her case the state of the proof was such as entitled her to a verdict, and it then devolved on appellants to meet the charge of negligence thus established by showing that they had observed their duty toward the deceased. This they sought to do by proving that examinations made the night of the accident failed to discover any defect in the wires or appliances. This the jury and the court below have said was not sufficient. The examination was not conclusive of the existence of the defect, and when the facts that four men were severely shocked on the same day and in substantially the same manner are considered, the inference that there must have been some undiscovered defect is too strong to be overcome by an examination made at night, without the aid of lights, of wires stretched eighteen to twenty feet above the earth. Finding no error in the record for which this judgment should be reversed, it is affirmed.

*Affirmed.*